**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Herrick, | No. CV-16-00254-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| GoDaddy.com LLC, | |
| Defendant. | |

This putative class action arises out of Defendant GoDaddy.com LLC's ("GoDaddy") alleged violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"), which prohibits the making of any call, including text messages, using an automatic telephone dialing system, to any telephone number assigned to a cellular telephone service, without the called party's consent.

Pending before the Court are three fully briefed motions: (1) Plaintiff John Herrick's ("Plaintiff") Motion to Strike Defendant GoDaddy.com LLC's Fourth Affirmative Defense of Consent as Legally Deficient (Doc. 74); (2) GoDaddy's Motion to Exclude the Expert Report and Opinion of Jeffrey A. Hansen (Doc. 83); and (3) GoDaddy's Motion for Summary Judgment, or in the Alternative, Motion to Stay (Doc. 79).

The Court finds that undisputed material facts show that GoDaddy did not use an automatic telephone dialing system ("ATDS") to send the text in question.  As such, Plaintiff cannot establish a claim under the Telephone Consumer Protection Act

("TCPA"). Summary judgment is thus granted in favor of GoDaddy. Because this finding is not predicated on the Federal Communications Commission's ("FCC") "potential capacity" guidance, GoDaddy's request to stay these proceedings is denied. GoDaddy's Motion to Exclude Plaintiff's expert and Plaintiff's Motion to Strike GoDaddy's affirmative defense are denied as moot.

## I.     BACKGROUND

GoDaddy is a provider of web-based products and services, including domain name registration, website hosting, and other online business applications. (Doc. 79 at 1; First Amended Complaint ("FAC"), Doc. 27 at ¶ 25). In 2015, GoDaddy contracted with a web-based software application company called 3Seventy, Inc. ("3Seventy") to send a one-text marketing campaign to nearly 100,000 of its customers using its 3Seventy Platform. (GoDaddy's Statement of Undisputed Fact ("Def. SOF"), Doc. 80 ¶¶ 1, 2; Plaintiff's Separate Controverting Statement of Undisputed Facts ("Pl. CSOF"), Doc. 91 ¶¶ 1, 2).

To conduct a text campaign using the 3Seventy Platform, a user must provide 3Seventy with a list of customer phone numbers, something GoDaddy did via its file transfer protocol ("FTP") site. (Def. SOF ¶ 7; Pl. CSOF ¶ 7).[1] 3Seventy then uploads the list of numbers to its 3Seventy Platform. (*Id.*) A user like GoDaddy navigates to the website, manually logs onto 3Seventy's Platform, and determines which numbers it would like to send a text message. (Def. SOF ¶¶ 8, 9; Pl. CSOF ¶¶ 8, 9). The user creates a message by manually typing in the desired content and selecting a time and date that the message will be sent. (Def. SOF ¶¶ 10, 11; Pl. CSOF ¶¶ 10, 11). As a final step, the user must type in what is referred to as a "captcha" – here, twelve alphanumeric values – to approve and authorize sending the message. (Def. SOF ¶ 12; Pl. CSOF ¶ 12). On the date and time specified by the user, the 3Seventy Platform sends the message to a Short Messaging Service ("SMS") gateway aggregator that then transmits the message directly to the cell phone carrier. (Pl. Separate Statement of Additional Supporting Facts

---

[1] Information as to the operation of the 3Seventy Platform was provided by John Wright, the chief executive officer ("CEO") and corporate representative from 3Seventy.

("Pl. SSOF ¶ 20).  Plaintiff received the offending text on December 15, 2015.  (FAC, Doc. 27 ¶ 28).  The single text message offered Plaintiff a "promo code" to "save 40% on new products." (*Id.*) Plaintiff alleges that GoDaddy sent the text to him without his consent. (*Id.*)

Plaintiff filed this action on January 28, 2016, asserting a single TCPA violation against GoDaddy.  On August 9, 2016, Plaintiff filed an amended complaint. (FAC, Doc. 27).  On February 1, 2017, GoDaddy answered the FAC, asserting, among others, the affirmative defense of consent.  (Answer, Doc. 68).  On March 3, 2017, Plaintiff moved to strike GoDaddy's consent defense as legally deficient.  (Doc. 74).  Soon thereafter, the parties completed the phased discovery ordered by the Court.  (Doc. 38).  This limited discovery was ordered in part so that the parties could explore whether the 3Seventy Platform was an ATDS under the TCPA.  (*Id.*)

On March 31, 2017, GoDaddy filed for summary judgment on the sole grounds that the 3Seventy Platform is not an ATDS.  GoDaddy alternatively asked that, if the Court was inclined to deny summary judgment in reliance on the FCC's "potential capacity" guidance, the Court stay these proceedings pending the Ninth Circuit's decision in *Marks v. Crunch San Diego*, No. 14-56834 (9th Cir. 2016).  On March 31, 2017, GoDaddy also moved to exclude the report and opinions of Plaintiff's expert Jeffrey A. Hansen. (Doc. 83).  All of the pending motions are opposed and fully briefed.[2]

The Court will first address GoDaddy's motion for summary judgment and the accompanying motion to stay.

## II.    DISCUSSION

### A. Legal Standards for Summary Judgment

Fed. R. Civ. P. 56(a) allows for summary adjudication of a claim or defense when the parties' discovery shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett*,

---

[2] The parties have requested oral argument. The Court denies the request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

477 U.S. 317, 323–24 (1986) (a principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims").  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*; *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts"). In cases where a reasonable juror could find for a nonmoving party, summary judgment is inappropriate. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) ("Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor").

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  But the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

The Court's function at this stage is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.   Thus, while the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50, 255.

. . . .

With these principles in mind, the Court now turns to the parties' arguments.

**B. "Automated Telephone Dialing Systems" Under the Telephone Consumer Protection Act**

To establish a claim under the TCPA, a plaintiff must show the unauthorized call or text was sent from an "automatic telephone dialing system."  The crux of GoDaddy's motion for summary judgment is that the 3Seventy Platform is not an "automatic telephone dialing system" as that term is defined by the TCPA and subsequent FCC regulations, and therefore, Plaintiff's Complaint should be dismissed.

The TCPA was enacted to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (quoting S. Rep. No. 102-178 at 1, 1991 U.S.C.C.A.N. 1968 (1991)).  Under the TCPA, it is unlawful "to make any call [or send any text message]…using any **automatic telephone dialing system**…to any…cellular telephone service," without the prior consent of the called party.  47 U.S.C. § 227(b)(1) (emphasis added).  *See also In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14155 ¶ 165 (2003) ("2003 FCC Order") (concluding that the statute's restriction on "mak[ing] any call" encompasses the sending of text messages); *Kristensen v. Credit Payment Servs., Inc.,* 879 F.3d 1010, 1013 (9th Cir. 2018).

The TCPA defines an ATDS, or what is often referred to as an autodialer, as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).  The Ninth Circuit has held that "[w]hen evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the *capacity* 'to store or produce telephone numbers to be called, using a random or sequential number generator.'" *Satterfield*, 569 F.3d at 951.  As such, "a system need not actually store, produce, or call randomly or sequentially

generated telephone numbers, it need only have the capacity to do it." *Id.*

Congress has given the FCC authority to issue interpretative rules pertaining to the TCPA. *See e.g.*, 47 U.S.C. § 227(b)(2) (directing the FCC to "prescribe regulations to implement the requirements of this subsection"); *ACA Int'l v. FCC*, 885 F.3d 687, 693 (D.C.C. 2018) ("The TCPA vests the Commission with responsibility to promulgate regulations implementing the Act's requirements"). In 2015, the FCC issued an order authorizing an expansive interpretation of the statutory term "capacity" in determining whether a device is an autodialer under the TCPA. *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C.R. 7961 (2015) ("2015 FCC Order"). Specifically, the 2015 FCC Order adopted an interpretation that would allow courts to consider not only a device's present uses or abilities in assessing whether it was an ATDS, but also its "potential functionalities." *Id.* at 7974.

In their briefs, the parties dispute whether the Court should apply the FCC's expansive interpretation of "capacity" in determining whether the 3Seventy Platform is an ATDS.[3] At the time that GoDaddy filed its Motion for Summary Judgment, eleven petitions relating to this broad definition had been consolidated in the D.C. Circuit Court of Appeals,[4] but the opinion had not yet been issued. After consolidation of these

---

[3] The Federal Communications Act ("FCA") requires that a party challenging the validity of a FCC order do so in a federal court of appeals. 47 U.S.C. § 402(a); 28 U.S.C. § 2342. Given this jurisdictional limitation, an order of the FCC that interprets the TCPA is binding on district courts until and unless a court of appeals decides to set it aside. 28 U.S.C. § 2342(1). *See also Luna v. Shac, LLC*, 122 F. Supp.3d 936, 939 (N.D. Cal. 2015) (noting that the Hobbs Act "jurisdictionally divests district court from ignoring FCC rulings interpreting the TCPA"). *But see e.g., Marks v. Crunch San Diego*, 55 F. Supp.3d 1288, 1291 (S.D. Cal. 2015) (finding that FCC does not have the statutory authority to expand the TCPA's definition of an ATDS because unlike 227(b) and (c), section 227(a) "does not include a provision giving the FCC rulemaking authority"). Unlike the defendant in *Marks*, GoDaddy does not argue that the FCC's interpretations of an ATDS are invalid because they are outside its rulemaking authority. Instead, GoDaddy argues that the Court need not look to the FCC interpretations in light of the Ninth Circuit's pronouncement in *Satterfield* that the statutory definition of an ATDS is "clear and unambiguous." (MSJ, Doc. 79 at 11 (citing 569 F.3d at 951 (finding that where the statutory text is "clear and unambiguous" the court's "inquiry begins with the statutory text, and ends there as well")).

[4] *See Prof'l Assoc. for C v. FCC*, No. 15-1440 (D.C. Cir. Dec. 11, 2015)*; Portfolio Recovery Assocs. v. FCC*, No. 15-1314 (D.C. Cir. Sept. 9, 2015); *Rite Aid Corp. v. FCC*, No. 15-1313 (D.C. Cir. Sept. 8, 2015); *Vibes Media, LLC v. FCC*, No. 15-1311 (D.C. Cir. Sept. 8, 2015); *Chamber of Commerce v. FCC*, No. 15-1306 (D.C. Cir. Sept. 3, 2015);

petitions, the Ninth Circuit *sua sponte* stayed a case dealing with issues related to the definition of an ATDS until the D.C. Circuit court issued its opinion.  *See Marks v. Crunch San Diego*, Case No. 14-56834 (9th Cir. Dec. 14, 2016).

On March 16, 2018, before this Court had ruled on the parties' motions, the United States Court of Appeals for the District of Columbia Circuit set aside the FCC's broad definition of "capacity", finding that it constituted an "unreasonably expansive interpretation of the statute."  *See ACA Int'l*, 885 F.3d at 692.  The court specifically held that the FCC's definition of an ATDS could not be sustained "at least given the Commission's unchallenged assumption that a call made with a device having the capacity to function as an autodialer can violate the statute even if autodialer features are not used to make the call."  *Id*. at 695.  In so finding, the *ACA Int'l* court did not, however, think that "capacity" necessarily only meant a device's "present ability."  *Id*. at 696 (expressing doubt that a definition of "capacity" that only accounted for a devices' "'present ability,' e.g., its current and unmodified state…should carry dispositive weight in assessing the meaning of the statutory term").  Indeed, the court stated that

> even under the ostensibly narrower, 'present ability' interpretation…a device that 'presently' (and generally) operates as a traditional telephone would still be considered [to] have the 'capacity' to function as an ATDS if it could assume the requisite features *merely upon touching a button* on the equipment to switch it into an autodialer mode.  Virtually any understanding of 'capacity' thus contemplates some future functioning state, along with some modifying act to bring that state about.

*Id*. (emphasis added).  The inquiry, suggested the *ACA Int'l* court, should therefore focus "less on labels such as 'present' and 'potential' and more on considerations such as **how much** is required to enable the device to function as an autodialer."  *Id*. (emphasis added).

. . . .

*Consumer Bankers Ass'n v. FCC*, No. 15-1304 (D.C. Cir. Sept. 3, 2015); *salesforce.com, Inc. v. FCC*, No. 15-1290 (D.C. Cir. Sept. 1, 2015); *Prof'l Ass'n for Customer Engagement, Inc. v. FCC*, No. 15-1244 (D.C. Cir. July 29, 2015); *Sirius XM Radio, Inc. v. FCC*, No. 15-1218 (D.C. Cir. July 14, 2015); and *Professional Association for Customer Engagement, Inc. v. FCC*, No. 15-2489 (7th Cir. July 14, 2015).

The D.C. Circuit Court of Appeals' decision in *ACA Int'l v. FCC* forecloses Plaintiff's argument that the FCC's expansive interpretation of the term "capacity" in its 2015 Order is binding on this Court.[5]  The Court thus declines Plaintiff's invitation to undergo an analysis of whether the 3Seventy Platform had the *potential* capacity to operate as an autodialer in 2015.  GoDaddy's request for a stay on these grounds is therefore denied as unnecessary.

However, the Court finds the *ACA Int'l* court's statement on the proper "capacity" inquiry both instructive and in line with Ninth Circuit precedent on the issue.  *See Satterfield*, 569 F.3d at 951 (remanding case where district court erroneously limited its analysis to only whether the system *actually* performed the requisite functions and not whether the system had the *capacity* to perform the requisite functions).  To the extent the Court finds the undisputed facts support GoDaddy's contention that the 3Seventy Platform lacked the ability to operate as an autodialer at the time the text message was sent, the Court will also investigate whether a dispute of material fact exists as to "how

---

[5] The precedential effect of *ACA Int'l* has been disputed by many district courts across the country, mostly in the context of determining whether a stay pending the D.C. Circuit Court's decision would be warranted. Courts have reached conflicting decisions on the issue. This Court finds that the decision in *ACA Int'l* is binding on district courts in this circuit.  Here, eleven petitions for review of the 2015 FCC Order were consolidated in the D.C. Circuit Court of Appeals – one of which originated in the Seventh Circuit.  *See Professional Association for Customer Engagement, Inc. v. FCC*, No. 15-2489 (7th Cir. July 14, 2015).  The Ninth Circuit has held that when agency regulations are challenged in more than one federal court of appeals, and subsequently consolidated and assigned to a single circuit court by the Judicial Panel on Multidistrict Litigation, the resulting decision is binding outside of that circuit.  *See Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) (noting that an Eleventh Circuit decision regarding the validity of an FCC order was "binding outside of the Eleventh Circuit" where the Judicial Panel on Multidistrict Litigation had consolidated challenges from both the Eleventh and Second Circuits). *Accord MCI Telecommunications Corp. v. U.S. West Communications*, 204 F.3d 1262, 1267 (9th Cir. 2000).  *Peck* and *MCI Telecommunications Corp.* both stand for the proposition that "if the D.C. Circuit were to vacate (or uphold) one or more of the challenged FCC interpretations, this court could not instead continue to follow the FCC's now-vacated (or not follow the FCC's now-affirmed) interpretations in resolving Plaintiff's claims."  *Sliwa v. Bright House Networks, LLC*, 2016 WL 3901378 at *3 (M.D. Fla. July 19, 2016).  *See also Marshall v. CBE Group, Inc.*, 2018 WL 1567852 at *5 n. 4 (D. Nev. Mar. 30, 2018) (rejecting Plaintiff's argument that *ACA Int'l* was not binding on that court).  Indeed, the Ninth Circuit's decision to stay at least one fully-briefed and argued appeal pending the D.C. Circuit's decision, *see Marks v. Crunch San Diego, LLC*, Case No. 14-56834 (9th Cir. Dec. 14, 2016), offers additional support that the decision would have binding effect on the Ninth Circuit Court of Appeals, which is of course binding on this Court.

much" would be required to enable such capacity. *ACA Int'l*, 855 F.3d at 692. If ATDS capacity could be enabled "merely upon touching a button," such fact will preclude summary judgment. *Id.* at 695. However, if more is needed, the 3Seventy Platform will not be considered an autodialer for purposes of the statute. *Id.* at 692. *See also Gragg v. Orange Cab Co. Inc.*, 995 F. Supp. 2d 1189, 1196 (W.D. Wash. 2014) (rejecting the suggestion that that *Satterfield* stood for the proposition that "a system that has to be reprogrammed or have new software installed in order to perform the functions of an ATDS" would nonetheless be an ATDS under the statute).

To fully understand what exactly amounts to having this "capacity," however, the Court must first determine what functions a device must have to qualify as an ATDS under the statute. The parties here, like many before them, dispute the boundaries of the required functions in subsections (A) and (B) of § 227(a)(1). These issues were also addressed by the *ACA Int'l* court.

### 1. Capacity "to store or produce telephone numbers using a random or sequential number generator"

GoDaddy first contends that the 3Seventy Platform does not have the capacity to store or produce telephone numbers to be called using a random or sequential number generator, as required by the language of § 227(a)(1)(A). Plaintiff disagrees, contending that the 3Seventy Platform has the capacity to store preprogrammed telephone numbers to be called, which pursuant to FCC interpretative guidelines, is all the statute requires. (Doc. 96 at 9).

Over the past two decades, parties have petitioned the FCC for clarification on what functions are required or omitted from the definition of an ATDS under the TCPA. *See e.g.,* 2003 FCC Order; *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559 (2008) ("2008 FCC Order"); *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 15391 (2012) ("2012 FCC Order") (collectively, "FCC ATDS Orders"). One of the issues that has repeatedly been raised is whether a device can qualify as an ATDS even though the device itself

does not have the capacity to generate numbers randomly or sequentially.  The FCC's guidance on these queries became increasingly muddled after it determined that "predictive dialers" should be included in the definition of an ATDS.  Commonly used by telemarketers, predictive dialers are devices that, among other things, dial numbers from preprogrammed lists as opposed to numbers that are randomly or sequentially generated.[6] In deciding to include predictive dialers in the definition of an ATDS, the FCC noted that

> [T]o exclude from [the restrictions on automated and prerecorded calls] equipment that use [sic] predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented.

2003 FCC Order at 14092-93.

In 2015, the FCC then seemed to confirm an even more expansive definition of "to store or produce telephone numbers using a random or sequential number generator" that would include devices beyond the limited category of predictive dialers.  *ACA Int'l*, 885 F.3d at 702.  In its review of the issue, the *ACA Int'l* court noted that the FCC's 2015 Order had again failed to offer meaningful, reasoned guidance as to the meaning of the phrase "using a random or sequential number generator."   *Id.* at 701.  Specifically, the court noted that the FCC had failed to clarify "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed" or whether it is "enough if the device can call from a database of telephone numbers generated

---

[6] As summarized in *Marks v. Crunch San Diego, LLC*: "In most cases, telemarketers [using predictive dialers] program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. The principal feature of predictive dialing software is a timing function, not number storage or generation. These machines are not conceptually different from dialing machines without the predictive computer program attached." 55 F. Supp. 3d 1288, 1293, n. 7 (S. D. Cal. 2014) (citing 2003 FCC Order at 14092).

elsewhere[.]" *Id*.   The court found the FCC "to be of two minds on the issue." *Id*.   On the one hand, said the court, the 2015 Order seemed to clearly distinguish (1) equipment that can randomly or sequentially generate numbers and then dial; from (2) equipment that merely dials from a stored calling list.  *Id*. at 702.   In doing so, the court observed that the FCC implicitly suggested that a device that did not randomly or sequentially generate numbers and dial would *not* qualify as an ATDS.  *Id.*  But in other respects, the court found that the 2015 Order also suggested that equipment can meet the statutory definition even if it did not have the ability to generate and dial random or sequential numbers.  *Id*.  Accordingly, the *ACA Int'l* court asked:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity?   The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers).  It might be permissible for the Commission to adopt either interpretation.   But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*Id*. at 702-03.   Given the lack of clarity on the issue, the court "set aside" the FCC's interpretations of "using a random or sequential number generator." *Id*. at 703.

As a result of the D.C. Circuit's holding on this issue, this Court will not defer to any of the FCC's "pertinent pronouncements" regarding the first required function of an ATDS, i.e., whether a device that has the capacity to store or produce telephone numbers "using a random or sequential number generator." *ACA Int'l*, 885 F.3d at 701 (rejecting FCC's objection that the court lacked jurisdiction to hear a challenge concerning the functions an ATDS must be able to perform on the grounds that the 2015 FCC Order merely reaffirmed prior orders on the issue: "The agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform").

To date, several courts in the Ninth Circuit have adopted the FCC's interpretation that a device may nevertheless meet the autodialer definition even when it only dials from a fixed set of numbers, e.g., when the device itself lacks the capacity to generate random or sequential numbers to be dialed. *See e.g., Luna*, 122 F. Supp. 3d at 940 (finding "fact

- 11 -

that [defendant's] system has the ability to send text messages from preprogrammed lists, rather than randomly or sequentially, does not disqualify it as an ATDS"); *Glauser*, 2015 WL 475111, at *6 (noting "the capacity for random/sequential dialing is not required for TCPA liability"); *McKenna v. WhisperText*, 2015 WL 428728, at *3 (N.D. Cal. Jan. 20, 2015) (noting the courts in the northern district of California have held that the 2003 FCC order encompasses more than just predictive dialers but also any equipment that stores telephone numbers in a database and dials them without human intervention).  But in so finding, these courts were bound and guided by the now-defunct FCC interpretations regarding this function.  As such, the Court is also not persuaded to follow these holdings, particularly because the FCC interpretations relied upon by these courts were driven by policy considerations and not the plain language of the statute.

Indeed, in light of the *ACA Int'l* decision, this Court declines to apply such a broad interpretation of this function.  Broadening the definition of an ATDS to include any equipment that merely stores or produces telephone numbers in a database would improperly render the limiting phrase "using a random or sequential number generator" superfluous.  *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 166 (2004) (courts are "loathe" to render a part of a statute superfluous).  As noted by the court in *Marks v. Crunch San Diego*, "[i]f the statute meant to only require that an ATDS include any list or database of numbers, it would simply define an ATDS as a system with 'the capacity to store or produce numbers to be called.'" 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014).  The statute, as that court also noted, is plainly more limited, and requires that the numbers be stored or produced *using a random or sequential number generator.  Id.  See also Satterfield*, 569 F.3d 951 (finding that where the statutory language is "clear and unambiguous," the court's "inquiry begins with the statutory text, and ends there as well").  *See also Cooper Indus., Inc.*, 543 U.S. at 167 (when possible court should follow "settled rule" and "construe a statute to give every word some operative effect").

The 3Seventy Platform used by GoDaddy did not have the ability "to store or produce numbers to be called, using a random or sequential number generator."

- 12 -

§ 277(a)(1).  Numbers that were called could only be inputted into the 3Seventy Platform by a preprogrammed file or list provided by the user; the Platform could not randomly or sequentially generate these numbers by itself.  Moreover, although it may be theoretically plausible that the 3Seventy Platform could be reprogrammed to have this capacity, it is undisputed that to enable such capability, a user would have to do much more than simply press a button.  *ACA Int'l*, 855 F.3d at 695.   Indeed, 3Seventy's CEO testified that, although he was unsure exactly what would have to be done to enable such a capability or how long it would take to do so, such modification could only be done at his directive.  (Doc. 81-1 at 34:12-36:1).  As such, a user of the 3Seventy Platform, even if armed with the programming knowledge necessary to enable it to generate numbers randomly or sequentially, would not be able to do so without the permission of 3Seventy's CEO.  The Court finds this barrier is akin to the auditing system used by the defendant in *Marks*, which banned users from inputting numbers into its system without their customer's consent or a customer's response to a call to action.  55 F. Supp. at 1292.  Like the defendant in *Marks*, GoDaddy's "access to the platform [was] limited," here, by 3Seventy's CEO.   Accordingly, the 3Seventy Platform lacked the capacity to become a device that could randomly or sequentially generate numbers to be dialed.

**2.  Capacity to dial numbers without human intervention**

But even if the Court were to find that the inability to randomly or sequentially generate telephone numbers did not disqualify the 3Seventy Platform from being an ATDS, its inability to dial numbers without human intervention would.

The FCC has repeatedly confirmed that the defining characteristic of an autodialer is the ability to "dial numbers without human intervention."  *ACA Int'l*, 885 F.3d at 703 (referencing the 2015 FCC Order at 7973 ¶¶ 14, 17; the 2008 FCC Order at 566 ¶ 13; and the 2003 Order at 14,092 ¶ 132). The *ACA Int'l* court found that such an interpretation "makes sense given that 'auto' in autodialer – or equivalently, 'automatic' in 'automatic telephone dialing system,' [] – would seem to envision non-manual dialing of telephone numbers."  *Id.* (internal citation to statute omitted).  Nevertheless, when the FCC was

asked to confirm in its 2015 Order "that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention," the FCC declined to do so. *Id.* (citing 2015 FCC Order at 7976 ¶ 20). The *ACA Int'l* court found the FCC's rejection of the human intervention test "difficult to square" with its prior pronouncements regarding an autodialer's "basic function." *Id.* It accordingly set aside the FCC's 2015 treatment of the matter. *Id.* (additionally noting that "[t]he order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the 'capacity' to perform the necessary functions").

*ACA Int'l's* holding on this issue clarifies that this Court is not bound by the FCC's 2015 rejection of the "human intervention" test. Instead, because the FCC's prior interpretations and pronouncements regarding the "basic function" of an autodialer (1) "make[] sense"; (2) are in accordance with the treatment of this issue by courts in the Ninth Circuit; and (3) are otherwise consistent with a reasonable interpretation of the statute, the Court finds that a device will only constitute an ATDS if it can dial numbers (or send text messages) "without human intervention." *Id.*

What constitutes the amount of "human intervention" required to take a device out of the category of an autodialer is a mixed question of fact and law. *See* 2015 FCC Order at 7973 ¶ 17 ("How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination"). Here, material facts related to how the 3Seventy Platform operated in sending the text to Plaintiff are undisputed. The parties disagree as to whether these undisputed facts amount to "human intervention" such that the 3Seventy Platform falls outside the TCPA's restrictive purview.[7]

. . . .

---

[7] Indeed, Plaintiff "denies in part" GoDaddy's statements of fact in paragraphs 8-13 on the grounds that these actions have nothing "to do with what it takes to 'send a text message.'" *See* Pl. SCOF ¶¶ 8-13. These are not factual disputes, however, but disputes as to the proper application of the law to those otherwise undisputed facts.

GoDaddy has identified multiple stages in the process of sending Plaintiff the text message in which human intervention was involved.  First, an employee of GoDaddy provided 3Seventy with a list of customer phone numbers via its FTP site, which 3Seventy then uploaded to the Platform.  (Def. SOF ¶ 7; Pl. CSOF ¶ 7). The employee then navigated to the website, logged onto 3Seventy's Platform, and selected the customer numbers it wished to send the text message.  (Def. SOF ¶¶ 8, 9; Pl. CSOF ¶¶ 8, 9).  The employee then drafted the message and selected a time and date to send the message.  (Def. SOF ¶¶ 10-11; Pl. CSOF ¶¶ 10-11).  Finally, the employee entered a "captcha" – a device designed to ensure that a human, not a robot, was authorizing the desired message.  (Def. SOF ¶ 12; Pl. CSOF ¶ 12).  Only after the employee entered the captcha was the 3Seventy Platform able to send the message.  (Zecchini Decl., Ex. 1, Doc. 81-1 at 109:5-13; 111).

In *Luna v. Shac, LLC*, the Northern District of California found similar types of human intervention precluded a system from being defined as an ATDS.  The facts in *Luna* are nearly indistinguishable from the facts here.  In *Luna*, like here, defendant had engaged a third-party mobile marketing company to provide defendant with a web-based platform so that it could send promotional text messages to its customers.  122 F. Supp. 3d at 937.  To send texts through that platform, an employee would similarly (1) input the numbers, either by typing them into the website or uploading them from an existing list of numbers; (2) log onto the platform to draft the message content; (3) designate the specific phone numbers to receive the message; and (4) click "send" on the website to transmit the message, which could be done either in real time or calendared to send at some future date.  *Id*.  The court there found that "human intervention was involved in several stages of the process prior to Plaintiff's receipt of the text message, and was not limited to the act of uploading the telephone numbers to the [platform's] database, as Plaintiff argues."  *Id*. at 941.  Specifically, the court found that "human intervention was involved in drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff."  *Id*.   The court held that

1    because the "text message was sent as a result of human intervention," the platform in

2    question was not an ATDS and summary judgment in favor of the defendant was

3    warranted.  *Id*.

4            Other California district courts have also reached the same conclusion under

5    similar facts.  *See McKenna*, 2015 WL 428728, at * 3-4 (dismissing complaint under

6    TCPA where allegations clearly stated that device could send text messages "only at the

7    user's affirmative direction to recipients selected by the user"); *Glauser*, 2015 WL

8    475111, at *6 (granting summary judgment on TCPA claim where text messages were

9    sent to plaintiff "as a direct response to the intervention" of the group's creator, where

10   creator had obtained numbers and uploaded them to the database).  *See also Gragg v.*

11   *Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1194 (W.D. Wash. 2014) (finding human

12   intervention to send texts was "essential" to system's ability to dial and transmit the

13   messages and as such system in question was not an ATDS).

14           Plaintiff says these cases are not persuasive because "they ignore and do not

15   acknowledge the FCC's 2015 Order and its rejection of a *per se* 'human intervention'

16   test." (Doc. 96 at 17).  As explained, however, the FCC's rejection of this test has been

17   set aside and is not binding on this Court.  As such, Plaintiff's argument that that these

18   stages of human intervention have "nothing to do with sending a text message" (Pl.

19   CSOF ¶ 13) is unpersuasive.  Moreover, the non-binding cases cited by Plaintiff in

20   support of its argument are distinguishable and/or no longer good law in light of *ACA*

21   *Int'l*.  *See Keim v. ADF Midatlantic, LLC*, 2015 WL 11713593, at *6 (S.D. Fla. 2015)

22   (finding FCC 2015 Order rejecting human intervention test precluded defendant's

23   argument that system was not at ATDS because text could only be sent by human

24   intervention); *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813 (N.D. Ill. 2014) (finding system in

25   question was an ATDS where the only human intervention identified prior to sending the

26   text was the "collection of numbers for [the system's] database of numbers"); *Johnson v.*

27   *Yahoo!, Inc.,* 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014) (noting although it was

28   "clear" that defendant's personalized message involved human intervention, issues of fact

1   remained as to whether system could also "'automatically' (i.e., without human
2   intervention)" send a system message).

3       The Court finds that the "level of human agency involved in transmitting the text"
4   amounts to essential human intervention that precludes defining the 3Seventy Platform as
5   an ATDS.  *Gragg*, 995 F. Supp. 2d at 1194. Like the defendant in *Luna*, the alleged
6   human intervention is not limited to GoDaddy's collection and transmission of numbers
7   to 3Seventy.  GoDaddy also had to then log into the system, create a message, schedule a
8   time to send it, and perhaps most importantly, enter a code to authorize its ultimate
9   transmission.  As such, the text was not sent automatically or without human intervention
10  and thus was not sent using an autodialer, as that term is defined under the TCPA.
11  Because Plaintiff cannot establish an essential element of his TCPA claim, GoDaddy's
12  motion for summary judgment is granted.

13      **3.  GoDaddy's Motion to Exclude Plaintiff's Expert Report**

14      As noted above, material facts related to the operation of the 3Seventy Platform
15  were undisputed.   The parties instead disputed (1) the governing law; and (2) the
16  application of the governing law to those undisputed facts.  On a motion for summary
17  judgment, expert opinions are relevant if they help determine the existence of a dispute of
18  material fact.  *See Celotex*, 477 U.S. at 324.  Here, Plaintiff's expert has offered only
19  conclusions of law with regard to the issues presented in the motion.  Accordingly, the
20  Court did not take his opinions into account in granting GoDaddy's motion.  GoDaddy's
21  motion to exclude this expert is therefore denied as moot.

22      For the foregoing reasons,

23      **IT IS ORDERED granting** GoDaddy's Motion for Summary Judgment
24  (Doc. 79).   GoDaddy's Motion to Stay, in the Alternative (Doc. 79), is **denied**.

25      **IT IS FURTHER ORDERED denying** Plaintiff's Motion to Strike Defendant
26  GoDaddy.com LLC's Fourth Affirmative Defense of Consent as Legally Deficient
27  (Doc. 74) and GoDaddy's Motion to Exclude the Expert Report and Opinion of Jeffrey
28  A. Hansen (Doc. 83) **as moot**.

**IT IS FINALLY ORDERED dismissing with prejudice** this matter in its entirety.  The Clerk of Court is respectfully directed to enter judgment accordingly and terminate this case.

**Dated** this 14th day of May, 2018.

Honorable Diane J. Humetewa
United States District Judge